UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| TARA S. RABUFFO, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 5:15-cv-06378 |
| | : | |
| VCA, Inc., | : | |
| | : | |
| Defendant. | : | |

_____

**MEMORANDUM OPINION**

**Defendant VCA's Motion for Summary Judgment, ECF No. 43 - Granted**

Joseph F. Leeson, Jr.                                                                                             November 23, 2016
**United States District Judge**

I.     **Introduction**

Plaintiff Tara Rabuffo, a veterinary surgeon, claims that her employer, Defendant VCA, Inc., failed to reasonably accommodate her cervical disc disability by refusing to permit her to return to work following cervical disc surgery, constructively discharged her on account of this disability, and discriminated against her because she has a record of having cervical disc disease. *See* Am. Compl., ECF No. 26. VCA moves for summary judgment on each of these claims, contending that it refused to permit Rabuffo to return to work not because of her cervical disc condition but rather because of its concern that two, unrelated health conditions that Rabuffo has—namely, a latex allergy and a heart condition—make it unsafe for her to work. Because the undisputed facts in this case show that VCA refused to permit Rabuffo to return to work because of its genuine concerns about her latex allergy and heart condition, and not because of any failure to accommodate her cervical disc condition, summary judgment is warranted in VCA's favor.

1

**II.     Background**

The following facts are undisputed. *See* Def.'s Facts, ECF No. 43-1; Pl.'s Resp. Facts, ECF No. 44.

VCA is a leading provider of pet health care services, with over 680 small animal veterinary hospitals throughout the United States and Canada. Def.'s Facts ¶ 1. Rabuffo is a veterinary surgeon. *Id.* ¶ 2. In August 2009, Rabuffo became employed by VCA as a veterinary surgeon at its Smoketown, Pennsylvania location after VCA acquired the veterinary hospital for which Rabuffo had been working. *Id.* ¶ 5.

Rabuffo has cervical degenerative disc disease. *Id.* ¶ 3. She also has a latex allergy, which causes her to have an anaphylactic reaction upon coming into contact with latex. *Id.* In order to combat the effects of the anaphylactic reaction, Rabuffo must immediately be injected with epinephrine, using an epinephrine pen. *Id.*

VCA accommodated both of these conditions. To accommodate her degenerative disc disease, VCA provided Rabuffo with two technicians to assist her during surgeries. *Id.* ¶ 7. The technicians performed radiographs on patients and lifted or carried any animals over twenty-five pounds. *Id.* To accommodate her latex allergy, VCA provided Rabuffo with latex-free gloves, surgical scrubs, and masks. *Id.* ¶ 8. With these accommodations, Rabuffo felt that she was able to perform all the essential functions of her job. *Id.* ¶¶ 7-8.

Despite the accommodations for her latex allergy, however, Rabuffo had five anaphylactic reactions to latex over a six-month period, from September 2010 to March 2011, while working at the Smoketown location. *Id.* ¶ 9. During three of these incidents, Rabuffo's veterinary technicians injected her with an epinephrine pen after she fainted. *Id.* ¶ 10. During one incident, Rabuffo lost consciousness after she injected herself with the pen, but a veterinary

technician was present to inject her a second time. *Id.* ¶ 11. In early 2011, Rabuffo's supervisor, the Smoketown Hospital Manager, Melanie Anastos, asked Rabuffo whether she was seeing a doctor about her latex allergy. *Id.* ¶13. According to Rabuffo, Anastos seemed legitimately concerned about her health. *Id.*

In April 2011, Rabuffo was granted leave by VCA to have surgery to treat her cervical disc degeneration. *Id.* ¶ 14. Pursuant to the Family and Medical Leave Act of 1993 (FMLA), Rabuffo was entitled to twelve weeks of protected leave, which was to expire on July 5, 2011. *Id.* VCA did not discourage Rabuffo from undergoing the cervical disc surgery. *Id.* ¶ 16. Although Rabuffo's surgery was originally scheduled for April 13, 2011, it had to be rescheduled to April 20, 2011, because an abnormal cardiac EKG required her to be examined by a cardiologist. *Id.* ¶ 19.

While Rabuffo was out on leave for the surgery, Anastos learned that Rabuffo had told a co-employee that the epinephrine injection she used for her latex allergy could be an issue in light of her newly-discovered heart condition. *Id.* ¶ 20. Rabuffo testified that Anastos "assumed that an epi-injection under current circumstances could be lethal" and "kept asking over and over the same question, could it be lethal, could it be lethal." *Id.* ¶ 21. When asked if Anastos seemed concerned about whether Rabuffo could die from taking an epinephrine injection given her heart condition, Rabuffo testified that she did. *Id.* Rabuffo told Anastos that although injecting epinephrine would not pose a risk of lethality, she would need to receive more than one injection in the event of any future allergic reactions because her heart medication would reduce the effectiveness of the epinephrine. *Id.* ¶ 23.

VCA asked Rabuffo to provide additional information from her doctor concerning whether it was safe for her to inject the epinephrine, given her heart condition, before VCA was

willing to allow her to return to work. *Id.* ¶ 24. In response, Rabuffo provided a note from her cardiologist, dated May 25, 2011, stating that Rabuffo was "able to use her epinephrine pen for any anaphylactic reactions which she may have during exposure to latex." *Id.* ¶ 25.

On June 6, 2011, Anastos sent Rabuffo a letter in which she wrote the following:

Based on your recent doctor's notes HR is requesting more information . . . . We need notes from your doctors stating the following information:

. . . .

- We understand that you are allergic to latex[;] if you need to use your epi pen can you administer this yourself or do you need a coworker to do this for you? Please have your doctor explain this in a note.

- In April prior to your surgery you mentioned that if you need to use your epi pen it could have a negative effect on your cardiac condition, specifically you stated it may cause you to go into cardiac arrest. Is this still a concern?

- HR Needs to have this information before you can return to work. Any questions please give me a call.

*Id.* ¶ 26; DiMaria Aff. Ex. 19, ECF No. 43-4.[1]

In response to Anastos's letter, Rabuffo obtained another note from her cardiologist dated June 10. *Id.* ¶ 27. The cardiologist confirmed that Rabuffo could use an epinephrine pen, but clarified that she "can administer it herself if her mental state is not compromised by allergic response. Otherwise, a co-worker can administer it." *Id.*

On June 28, Anastos sent an e-mail to VCA's Human Resource Manager, Wendy Jaros, explaining her concern about Rabuffo's safety at VCA: "[P]rior to Dr. Rabuffo's leave she said that if she were to get an epi injection she could die from it due to her heart condition. I do not

---

[1] Rabuffo denies that she ever told Anastos that using the epinephrine pen could have a negative impact on her heart condition or could cause her to go into cardiac arrest. Pl.'s Resp. Facts ¶ 26.

4

want to have an employee give her an injection that could possibly harm or kill her." *Id.* ¶ 29.[2] In response, Jaros advised Anastos that VCA could not accommodate Rabuffo's latex allergy unless Rabuffo could administer the epinephrine pen herself, without the assistance of co-workers, as VCA did not want to require other staff members to assume responsibility for treating Rabuffo's medical condition. *Id.* ¶ 31.

Jaros further advised Anastos that as an accommodation, VCA would place Rabuffo on a leave of absence until a determination could be made by VCA as to whether it could safely accommodate her latex allergy. *Id.* ¶ 32. Anastos responded that Rabuffo was already on FMLA leave (for her cervical disc degeneration surgery). *Id.* When asked by Jaros why Rabuffo's use of the epinephrine pen had become an issue now, Anastos explained:

> The reason this has come up is that prior to her surgery Dr. Rabuffo had an EKG & this showed some heart issues, her surgery was postponed for a few days and when Dr. Rabuffo called me to talk to me she stated that she may not be able to get any more epi injections because it could kill her. This statement started all the concerns. Her cardiologist said in his note that she may give them herself unless she passes out then she would need assistance.

*Id.* ¶ 30.

On July 1, Rabuffo's cervical disc surgeon provided a note stating that Rabuffo could return to work on July 18, 2011, with lifting and hours restrictions. *Id.* ¶ 33. Although Rabuffo's surgeon cleared her to return to work with restrictions, the inconsistent notes provided by her cardiologist left unresolved the issue of whether Rabuffo could safely return to work given her latex allergy and heart condition. *Id.* ¶ 35. Jaros thus advised Anastos that before Rabuffo could return, VCA needed another doctor's note addressing whether the epinephrine injections were safe given Rabuffo's heart condition and whether she would be able to inject herself. *Id.*

---

[2] Again, Rabuffo denies that she told Anastos that use of epinephrine could kill her. Pl.'s Resp. Facts ¶ 29.

On July 6, Anastos sent a text message to Rabuffo informing her that VCA's human resources department had additional questions about her limitations and the interaction of epinephrine with her heart condition. *Id.* ¶ 36. Specifically, Anastos asked that Rabuffo's doctor provide further information about her heart condition, whether the use of the epinephrine pen could harm her, and whether another person would need to administer the epinephrine pen for her. *Id.*

On July 8, Rabuffo's cardiologist provided another note, this time stating only that Rabuffo could inject herself with epinephrine. *Id.* ¶ 37. In contrast with his June 10 note, he omitted any mention of the possibility of Rabuffo's mental state being compromised or that her co-workers may need to inject her with the epinephrine pen if that were to occur. *Id.*[3] This note also failed to provide all of the information that Anastos had requested. *Id.* Further, none of the cardiologist's notes contained any mention of the fact that, as Rabuffo had asserted to Anastos, she would now require two epinephrine shots instead of just one. *Id.*

On July 13, Anastos sent an e-mail to Jaros asking, "What happens when she has a latex reaction & passes out & is unable to give herself an injection?" *Id.* ¶ 39. On July 14, Lisa Hewlett, VCA's Area Supervisor, advised Rabuffo that VCA's human resources department "need[s] to make sure everything is very clear, because we don't want you hurting yourself. . . . Your health is everyone's first priority, so don't worry." *Id.* ¶ 41. Hewlett told Rabuffo that the human resources department would be seeking additional information and that Rabuffo could not return to work until she had provided that information. *Id.* ¶ 42.

Also on July 14, VCA's Director of Human Resources, Maria Druse, began to address the issue of Rabuffo's return to work by reaching out to VCA's Vice President of Risk

---

[3]   Rabuffo admitted that her cardiologist's July 8 note was inconsistent with his June 10 note. *Id.* ¶ 38

Management, Angelica Barbosa, and VCA's in-house counsel, Rachael Jeck. *Id.* ¶ 43. The following day, Barbosa forwarded to Druse the Accident and Injury Report forms for Rabuffo's previous anaphylactic reactions to latex at work. *Id.* ¶ 44. Upon receipt of these forms, Druse further conferred with VCA's in-house counsel, attorney Jeck. *Id.* ¶ 45.

On July 24, as part of her investigation, Druse sent an e-mail to Anastos, Hewlett, and Susan Taylor, VCA's Regional Manager, requesting information about Rabuffo's latex allergy, including the accommodations that had been made for Rabuffo, how Rabuffo responds to contact with latex, whether she loses consciousness, and whether staff members need to inject her with epinephrine. *Id.* ¶ 46. The next day, Anastos responded to Druse's e-mail by outlining the accommodations that had been made for Rabuffo's latex allergy and describing her previous allergic reactions. *Id.* ¶ 47.

On July 27, Rabuffo's attorney sent a letter to Druse informing her that Rabuffo's surgeon had released her to work with limited restrictions effective July 18 and that Rabuffo had notified Anastos that she intended to return to work on that date, but that Rabuffo still had not been permitted to return. *See id.* ¶ 49; DiMaria Aff. Ex. 8, ECF No. 43-4. Rabuffo's attorney stated that Rabuffo was ready, willing, and able to perform the essential functions of her job, and he warned that a prolonged mandated leave would be considered discriminatory. Def.'s Facts ¶ 49; DiMaria Aff. Ex. 8.

On August 4, Druse sent an e-mail to Rabuffo's attorney, advising him that his July 27 letter had been received and that VCA's in-house counsel would respond to his letter. Def.'s Facts ¶ 50. On August 11, Rabuffo's attorney sent an e-mail to Druse reminding her that he had still not received a response to his July 27 letter. *Id.* ¶ 51.

7

Around this same time, VCA consulted with outside counsel concerning Rabuffo's situation, and VCA's in-house counsel, attorney Jeck, continued to discuss Rabuffo with Druse. *Id.* ¶¶ 52-53.

On August 16, attorney Jeck sent an e-mail to Rabuffo's attorney informing him that she was looking into the situation and gathering information, and that she would respond to his letter by August 19. *Id.* ¶ 54. Between August 17 and August 19, Jeck had numerous e-mail communications with outside counsel. *Id.* ¶ 55. On August 19, Rabuffo's attorney wrote to Jeck, stating that Rabuffo now considered herself to have been "constructively discharged." *Id.* ¶ 56.

No one at VCA ever told Rabuffo that her employment was terminated, threatened to terminate her, or suggested she should resign. *Id.* ¶ 57. According to Rabuffo, she felt she had no choice but to resign because VCA did not allow her to return to work immediately after her FMLA leave expired. *Id.* ¶ 59. Rabuffo also felt she was treated in an intolerable manner because VCA kept asking her for additional documents from her doctors, and telling her that what she already provided was insufficient. *Id.* However, Rabuffo admitted that she never indicated to anyone at VCA that she would have felt compelled to resign if VCA did not immediately return her to work. *Id.* ¶ 60.

On August 31, Jeck sent Rabuffo's attorney a letter stating that VCA "has initiated the interactive process to determine whether Dr. Rabuffo is capable of safely performing the essential functions of her job with or without reasonable accommodation." *Id.* ¶ 61; DiMaria Aff. Ex. 39, ECF No. 43-5. She also asked that Rabuffo provide further information about her latex allergy and cervical disc condition, and she stated that "[a]s an interim reasonable accommodation, Dr. Rabuffo will be placed on a personal leave until the interactive process is completed." Def.'s Facts ¶ 61; DiMaria Aff. Ex. 39.

Neither Rabuffo nor her attorney responded to Jeck's letter or sent VCA any additional information regarding her condition or her ability to safely perform the essential functions of her job with or without a reasonable accommodation. Def.'s Facts ¶ 62.

In August 2011, Rabuffo timely filed charges with the Pennsylvania Human Rights Commission (PHRC) and the Equal Employment Opportunity Commission (EEOC). During the pendency of the PHRC proceedings, Rabuffo withdrew her action from the PHRC in order to file the present action. She alleges that VCA violated the ADA and PHRA by failing to reasonably accommodate her cervical disc condition, constructively discharging her on the basis of this condition, and discriminating against her on the basis of her latex allergy[4] and her record of having disabilities[5] (or because VCA regarded her as having disabilities).[6] *See* Am. Compl.

## III. Standard of Review – Summary Judgment

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact"—that is, that no reasonable jury could return a verdict for the nonmoving party—and that "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The parties must support their respective contentions either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P.

---

[4] Rabuffo's "latex-related disability discrimination" claim was dismissed by the Court, upon VCA's motion, for failure to exhaust administrative remedies. *See* Memorandum & Order, August 8, 2016, ECF Nos. 38, 39.

[5] With respect to her record-of-disability claim, Rabuffo acknowledges that no evidence exists that the PHRC ever investigated whether she was discriminated against because she had a record of disability and that she never raised that claim in the PHRC. *See* Def.'s Facts ¶ 74.

[6] VCA states that during Rabuffo's deposition, her attorney advised that Rabuffo is not pursuing a claim for "regarded as" disability discrimination and that she is withdrawing that claim from her Amended Complaint.

56(c)(1). When the party moving for summary judgment does not bear the burden of proof at trial, that party thus has the choice to either "produce evidence negating an essential element of the nonmoving party's case, or . . . show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). A party choosing the latter option may not simply make a "conclusory assertion that the nonmoving party has no evidence." *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 84 n.2 (3d Cir. 1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (Brennan, J., dissenting)). Instead, the moving party must "affirmatively show the absence of evidence in the record," which "may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of documentary evidence," or, "[i]f there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories and other exchanges between the parties that are in the record." *Id.*

**IV.     Analysis**

**A.     VCA is entitled to summary judgment on Rabuffo's failure to accommodate claims.**

Title I of the Americans with Disabilities Act of 1990 (ADA) provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). A "qualified individual" is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8). Accordingly, to establish a prima facie case of discrimination under the ADA, a plaintiff must show (1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) she has suffered an

10

otherwise adverse employment decision as a result of discrimination. *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004) (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999)).

A failure to make reasonable accommodations is one type of adverse employment decision. *Id.* In this respect, the ADA specifically provides that one way an employer can engage in unlawful discrimination under the statute is by

> (A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or
>
> (B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant.

42 U.S.C. § 12112(b)(5)(A)-(B). In short, "[t]he Act requires preferences in the form of 'reasonable accommodations' that are needed for those with disabilities to obtain the *same* workplace opportunities that those without disabilities automatically enjoy." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 397 (2002).

"In handling a disabled employee's request for a reasonable accommodation, 'both parties [employers and employees] have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith'" through what is commonly called the "interactive process." *See Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 187 (3d Cir. 2009) (alteration in original) (quoting *Taylor*, 184 F.3d at 312). An employer that fails to engage in the interactive process to search for a reasonable accommodation may be liable under the ADA if the employee can show that:

11

>1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*See Taylor*, 184 F.3d at 319-20.[7]

Rabuffo's claims of discrimination are based solely on her cervical disc condition, not her latex allergy. (As noted above, although it is undisputed that Rabuffo also has a latex allergy, the Court previously dismissed Rabuffo's claims that VCA discriminated against her on the basis of that condition because she failed to exhaust her administrative remedies.) Rabuffo contends that, following her cervical disc surgery, she asked to return to work with restrictions as a reasonable accommodation for her cervical disc condition, but VCA failed to provide this or any other reasonable accommodation and failed to participate in good faith in the interactive process to search for a reasonable accommodation.

VCA, on the other hand, contends that it accommodated Rabuffo's cervical disc disability after her surgery by permitting her to remain on leave after her FMLA leave expired on July 5. Further, VCA contends that Rabuffo's proposed accommodation—returning her to work—was unreasonable because VCA "was still engaging in a separate interactive process to determine whether [she] was capable of safely performing the essential functions of her job due to her severe latex allergy and heart condition." Def.'s Br. Supp. Mot. 23, ECF No. 43-7. According to VCA, its refusal to permit Rabuffo to return to work was based on its concerns relating both to

---

[7] Pennsylvania courts generally interpret the PHRA in accordance with its federal counterparts. *See Kelly v. Drexel Univ.*, 94 F.3d 102, 104 (3d Cir. 1996). The PHRA is to be interpreted "as identical to federal anti-discrimination laws except where there is something specifically different in its language" justifying different treatment. *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002). As there are no such differences in this case, the Court will interpret the PHRA "as applying identically in this case and governed by the same set of precedents" as the ADA. *See id.*

her safety and to the fact that another VCA employee might have to administer an epinephrine shot that could harm her. *Id.* at 24. VCA contends that it could not reasonably return Rabuffo to work until it was satisfied that she could safely do so, and VCA was "unwilling to have another VCA employee administer an injection to [Rabuffo] that could harm (or even kill) her." *Id.* at 25.

Rabuffo responds that VCA's "purported 'safety' concern" about her latex allergy and heart condition cannot reasonably be believed, for two reasons. Pl.'s Br. Opp'n 6, ECF No. 44-1.

First, she contends that VCA had been well aware of her latex allergy and use of epinephrine since the summer of 2010, prior to her first allergic reaction in the workplace, and had never expressed concerns about her safety in the workplace until after she went on leave for cervical disc surgery. She recalls that in the summer of 2010 she conducted a workshop to train VCA's staff and management on how to administer the epinephrine pen to her in the event she could not do so. She observes that members of the VCA staff successfully responded to her latex-exposure incidents in late 2010 and early 2011, and no one at VCA ever expressed concern or discomfort with this procedure.

Second, Rabuffo contends that VCA's "conduct in stalling [her] return to work lacks believability," particularly in view of the fact that she promptly responded to each of VCA's requests for information concerning her use of the epinephrine pen. *Id.* at 9. In particular, she points out that following VCA's July 6, 2011 request for further information about her use of the epinephrine pen, she provided a note from her cardiologist only two days later, but did not receive a substantive response from VCA until August 31, 2011, at which point Rabuffo had already informed VCA that she considered herself to be constructively discharged.[8] Further, in

---

[8] Rabuffo contends that by August 19, 2011—the date on which she informed VCA that she considered herself to be constructively discharged—she had been out of work for fifty-nine days since the date she was cleared to fully return to work. This figure is based on her contention

Rabuffo's view, the record shows that VCA never conducted an internal investigation as to whether Rabuffo's latex allergy and heart condition could pose a safety risk. For these reasons, Rabuffo contends that a finder of fact "may reasonably choose to disbelieve [VCA's] articulated reason for refusing to return [Rabuffo] to employment." *Id.* at 13.

As the above discussion reveals, the parties' contentions in this case focus not on Rabuffo's cervical disc disability and reasonable accommodations for that disability, but rather on Rabuffo's latex allergy and heart condition, and whether a jury could disbelieve VCA's contention that its concerns about those conditions were the reason for delaying her return to work. If VCA's concerns about Rabuffo's latex allergy and heart condition were genuine, then permitting Rabuffo to return to work despite those unresolved concerns would not be a reasonable accommodation for any limitations caused by Rabuffo's cervical disc condition. Likewise, if VCA's concerns were genuine, then its decision to delay Rabuffo's return to work was not "based on the need . . . to make reasonable accommodation" for her cervical disk condition. *See* 42 U.S.C. § 12112(b)(5)(A)-(B).[9] As set forth above, however, Rabuffo contends that VCA's stated concerns about her latex allergy and heart condition were merely a pretext for its discrimination on the basis of her cervical disc condition. Because Rabuffo's case turns on

---

that on May 20, 2011, her surgeon cleared her to return for office consults, but not surgeries. Pl.'s Resp. Facts ¶¶ 137-40. However, VCA points out that her surgeon stated in a note on that date that Rabuffo "cannot return to work at this time." *See* Def.'s Reply 1. In any event, it is undisputed that a few days later, on May 26, 2011, Rabuffo's surgeon authored a note permitting her to return to work with restrictions. *See id.* But he then authored *another* note less than a month later, on June 14, stating that Rabuffo could *not* return to work at that time. *See id.* Ultimately, the parties agree that in a July 1 note, her surgeon cleared her to work with restrictions beginning on July 18, 2011. Counting from that date, approximately one month elapsed before Rabuffo's counsel submitted his letter asserting that she had been constructively discharged.

9  Again, the question of whether VCA reasonably accommodated any limitations caused by Rabuffo's latex allergy or otherwise discriminated against her on the basis of that condition is not before the Court.

VCA's intent, her case more closely resembles a disparate treatment claim than a failure-to-accommodate claim, the latter of which generally does not take into consideration an employer's intent. *See Solomon v. Sch. Dist. of Philadelphia*, 882 F. Supp. 2d 766, 777–78 (E.D. Pa. 2012) ("An employer need not have been motivated by discriminatory animus in failing to reasonably accommodate an employee."). In a disparate treatment claim, by contrast, once the plaintiff has made a prima facie case of disability discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action and, once the defendant has provided such a justification, the burden then shifts back to the plaintiff to demonstrate that the stated reason is a mere pretext for discrimination. *See Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000).

Here, assuming Rabuffo has established a prima facie case of disability discrimination,[10] VCA has articulated a legitimate, nondiscriminatory reason for refusing to permit Rabuffo to return to work—namely, its concerns about her latex allergy and heart condition. Rabuffo, however, has failed to satisfy her burden of adducing sufficient evidence for a jury to conclude that this explanation is pretextual. Rather, the undisputed facts of this case show that VCA was genuinely concerned about Rabuffo's latex allergy and heart condition and that these concerns were the reason VCA refused to permit Rabuffo to return to work.[11] As set forth above, Rabuffo

---

[10] Barring an employee from returning to work can constitute an adverse employment decision, which is the third element of a prima facie case of disability discrimination. *See Solomon v. Sch. Dist. of Philadelphia*, 882 F. Supp. 2d 766, 781 (E.D. Pa. 2012) ("If failing to *make* a reasonable accommodation is an adverse employment decision, it would appear that *barring* an employee from returning to work unless she could do so without accommodations—which, functionally, appears to us to be the logical equivalent of the former—would similarly qualify as such an action.").

[11] The question of whether VCA's concerns were justified or whether VCA appropriately addressed these concerns is not at issue in the Court's analysis of whether these stated concerns were pretextual. *See Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) ("To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision

acknowledges that Anastos asked her about her latex allergy in early 2011, prior to Rabuffo's cervical disc surgery, and that Anastos appeared to Rabuffo to be legitimately concerned about her health. Rabuffo also acknowledges that while she was on leave for surgery, Anastos learned that the epinephrine injections could be dangerous given Rabuffo's newly-discovered heart condition and that Anastos seemed concerned about whether an epinephrine injection could be fatal. This fact, in particular, explains why and how VCA's concerns about Rabuffo's latex allergy increased after Rabuffo went on leave for surgery. Rabuffo also acknowledges that VCA engaged in numerous internal communications in June and July 2011 concerning her latex allergy and heart condition. These internal communications are consistent with VCA's statements to Rabuffo and show that VCA was genuinely concerned about Rabuffo's latex allergy and heart condition. In short, from May through August 2011, VCA repeatedly and clearly communicated to Rabuffo its concerns about her latex allergy and heart condition and discussed these same concerns internally. There is no evidence in the record from which a jury could conclude that these concerns were a mere pretext to conceal VCA's intention to discriminate against Rabuffo on the basis of her cervical disc condition. VCA is therefore entitled to summary judgment on Rabuffo's disability discrimination claims, whether they are construed as failure to accommodate claims or disparate treatment claims.

**B.    VCA is entitled to summary judgment on Rabuffo's constructive discharge claims.**

A constructive discharge occurs when an "employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 887 (3d Cir. 1984). "[N]o finding of a

---

was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.").

specific intent on the part of the employer to bring about a discharge is required for the application of the constructive discharge doctrine." *Id.* at 888.

Rabuffo claims that VCA's failure to accommodate her cervical disc condition resulted in her constructive discharge. However, for the reasons stated above, Rabuffo has failed to adduce any evidence that VCA permitted "conditions of discrimination in employment" on the basis of that condition, let alone conditions "so intolerable that a reasonable person subject to them would resign." *See id.* VCA is therefore entitled to summary judgment on Rabuffo's constructive discharge claims.

**C.     VCA is entitled to summary judgment on Rabuffo's record-of-disability claim.**

Rabuffo also alleges, in the alternative, that VCA discriminated against her because she had a "record of" disability. VCA contends that this claim fails as a matter of law because Rabuffo failed to exhaust her administrative remedies with respect to this claim. Rabuffo acknowledges that she did not raise this claim before the PHRA. Accordingly, it is undisputed that Rabuffo failed to exhaust her administrative remedies, and VCA is entitled to summary judgment with respect to this claim.

**V.     Conclusion**

For the reasons set forth above, VCA is entitled to summary judgment on each of Rabuffo's claims. A separate order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge